IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | | |
|---|---|---|
| NORTH IDAHO COMMUNITY ACTION NETWORK, | ) ) ) | CIVIL No. 05-0273-N-EJL |
| Plaintiff, | ) ) | **MEMORANDUM ORDER** |
| vs. | ) ) | |
| U.S. DEPARTMENT OF TRANSPORTATION; *et al.*, | ) ) ) | |
| Defendants. | ) | |

**MEMORANDUM ORDER**

Before the Court in the above entitled matter are the Plaintiff's motion for summary judgment, the Agencies's cross-motion for summary judgment, and the Plaintiff's motion to supplement the administrative record and take judicial notice. The parties have submitted their briefing on the motions and the matters are now ripe for the Court's review.

**Factual and Procedural Background**

NICAN challenges a proposed US-95 highway project ("Project") near the city of Sandpoint. The Project has been proposed to address serious traffic congestion and traffic flow problems on US-95 in the Sandpoint area.

On May 23, 2000, the Federal Highway Administration and Idaho Transportation Department ("Agencies") issued a record of decision for the Project. In this decision, the Agencies selected the "Sand Creek Two-Lane Alternative," which was the preferred alternative in the

MEMORANDUM ORDER                    1

Agencies's final environmental impact statement ("EIS"). The project as set forth in the EIS consisted for four segments: Sagle to Long Bridge, Long Bridge Widening, Sand Creek Byway, and Sandpoint to Kootenai Cut Off Road.

In the Sagle to Long Bridge segment, the Agencies proposed a widening of US-95 from two to four lanes. In the Long Bridge segment, the Agencies proposed widening Long Bridge over the Pend Oreille River to accommodate 4-lanes and a bicycle/pedestrian facility. In that Sand Creek Byway segment, the Agencies proposed (1) constructing two miles of a new two-lane highway along the east side of Sand Creek; (2) building a partial interchange/bridge structure over Sand Creek and Bridge Street; and (3) a full diamond interchange at the junction of US-95 and State Highway 200 in Ponderay. Finally, for the Sandpoint to Kootenai Cutoff Road segment, the Agencies proposed to widen the US-95 from two to four lanes.

On April 15, 2005, the Agencies released a revised environmental assessment ("EA") that made eleven changes to the design that had been outlined in the EIS. These eleven changes only occurred in the Sand Creek Byway segment. The changes included: (1) building a southbound off-ramp at the south interchange of the Sand Creek Byway; (2) adding a third lane to the proposed highway; (3) building a shoreline extension of the east shoreline of Sand Creek; (4) building a bridge over Sand Creek; (5) building a vegetated, concrete wall embankment; (6) building a new short bridge over Bridge Street; (7) constructing a new light weight structure over the new roadway near the Railroad Depot; (8) constructing a new railroad embankment; (9) constructing a pedestrian and bicycle pathway along Sand Creek; (10) building three artificial habitat enhancement areas in Sand Creek; and (11) building a north loop off ramp.

MEMORANDUM ORDER                    2

These eleven changes were first presented in the EA and were not discussed or analyzed in the EIS.  On August 17, 2006, the Agencies released an environmental re-evaluation.  This re-evaluation set forth additional changes, most of which involved dredging Sand Creek.  As a result of this dredging activity, approximately 17,035 cubic yards of material would be removed from Sand Creek.

## Standard of Review

When reviewing agency decisions under the NEPA, an agency action can be "overturned only where it was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 961-62 (9th Cir. 2006) (quoting 5.U.S.C. § 706(2)(A)).  To determine whether a decision was arbitrary and capricious, the Court looks to "'whether the decision was based on a consideration of relevant factors and whether there has been a clear error of judgment.'" *Id*. at 962 (quoting *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, 1149 (9th Cir. 1998)).  Additionally, the court "must ensure that the agency 'took a hard look at the environmental consequences of its action.'" *Id*. (quoting *Nw. Res. Info. Ctr., Inc., v. Nat'l Marine Fisheries Serv.*, 56 F.3d 1060, 1066 (9th Cir. 1995)).

## Analysis

### I.    NEPA Claims

The NEPA is the "basic charter for protection of the environment."  40 C.F.R. § 1500.1(a).  It establishes policies and procedures that insure that "environmental information is available to public officials and citizens before decisions are made and before actions are taken." *Id*. § 1500.1(b).

MEMORANDUM ORDER                3

NICAN claims that the Agencies violated the NEPA by (1) failing to assess the combined impact of the original design, eleven changes, and dredging needed to the Sand Creek byway segment of the Project in a single EIS; (2) deferring consideration of impacts for three of the four segments of the Project; (3) failing to consider any alternatives to the current, proposed action; (4) failing to prepare a supplemental environmental impact statement; (5) failing to take a hard look at impacts to Sand Creek; and (6) failing to take a hard look at the impacts to historic properties.

A)      *The Agencies were not required to prepare a single EIS*

NICAN argues that the Agencies were required to prepare a single EIS because the project and subsequent changes were "connected actions."  The Agencies responded by arguing that subsequent changes do not require a single EIS, but rather would require, at most, a supplemental EIS.  The Court agrees with Agencies that the "connected actions" requirements are not applicable in this case.

A single comprehensive environmental review can be required for "distinct projects" in certain circumstances.  *See Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 893-94 (9th Cir. 2002).  This comprehensive environmental review is required for distinct projects when a single proposal governs the projects or the projects are connected, cumulative, or similar actions. *Id*. at 893-94.  "The purpose of this requirement is 'to prevent an agency from dividing a project into multiple 'actions,' each of which individually has an insignificant environmental impact, but which collectively have a substantial impact.'" *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 969 (9th Cir. 2006).

In *Native Ecosystems Council*, the plaintiffs were challenging a Forest Service's timber sale that was part of a Congressionally-authorized program. *Id*. at 890. There were twelve sales planned as part of the program, but the plaintiffs only challenged one of those sales in its lawsuit. *Id*. The plaintiffs argued that the Forest Service was required to issue one comprehensive environmental review document for all twelve sales. *Id*.

The Ninth Circuit treated the various timbers sales in *Native Ecosystems Council* as "distinct projects" because the sales were conducted separately and there was no proposal that covered all twelve sales. *See id*. at 894-95. That case involved separate or distinct plans, not a single project that was subsequently changed.

Other cases that required a single EIS also involved distinct projects, not subsequent changes to an initial proposal. *Thomas v. Peterson*, 753 F.2d 754, 758 (9th Cir. 1985) (a single EIS was required for a logging project and a road project that was designed to facilitate that logging); *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998) (a single EIS was required for five potential logging projects in the same watershed).

Further, the Ninth Circuit has not required that subsequent phases of a project be evaluated in a single EIS when the subsequent phases have not been completed or authorized. *Wetlands Action Network v. U.S. Army Corps of Engineers*, 222 F.3d 1105, 1119 (9th Cir. 2000). In *Wetlands*, there was a three-phase project, but only the details of the first phase had been planned when the developer applied for the permit. *Id*. Because the subsequent phases were not fully developed initially, requiring the government to analyze the impacts of all three phases in a single EIS "would require the government to do the impractical." *Id*.

MEMORANDUM ORDER                    5

Finally, when addressing subsequent changes to proposed actions, the regulations discuss preparing a supplemental EIS rather than one comprehensive EIS. *See* 23 C.F.R. § 771.130. Pursuant to the regulations, a supplemental environmental impact statement is required when changes to the proposed action would result in significant environmental impacts that were not evaluated in the initial environmental impact statement. *Id*. § 771.130(a)(1).

Here, the Agencies did not abuse their discretion when they did not evaluate the initial plan and the subsequent changes in a single EIS. The Agencies did not create another comprehensive EIS after changes were made to one of the phases. This decision to not create another comprehensive EIS was not an abuse of discretion because the regulations require a Supplement EIS rather than a single EIS if the subsequent changes to the plan would result in significant environmental impacts.

The cases that have required a single EIS are consistent with this finding. Those cases did not involve subsequent changes to an initial plan; they involved separate projects or separate phases that were improperly segmented to avoid proper evaluation of the environmental consequences. In contrast, here, the Agencies prepared an EIS for the original design and then evaluated whether subsequent changes to that initial plan would require a supplemental EIS. The decision to not create one comprehensive EIS was not an abuse of discretion, so the issue becomes whether the Agencies's decision to not supplement the EIS was an abuse of discretion.

B)     *The Agencies did not improperly defer the consideration of impacts associated with three segments of the Project*

NICAN argues that the Agencies improperly deferred consideration of the environmental impacts of the other three segments of the Project: Sagle to Long Bridge, Long Bridge Widening, and Sandpoint to Kootenai Cutoff Road. Because the Agencies considered the impact of the

MEMORANDUM ORDER                  6

segments in the EIS, EA, and re-evaluation and a more detailed analysis was not possible, the Court rejects this argument and finds in favor of the Agencies.

When evaluating whether an EIS sufficiently analyzes the significant environmental impacts, this Court reviews whether the agency took a "hard look" at those environmental consequences. *State of Cal. v. Block*, 690 F.2d 753, 761 (9th Cir. 1982). Under the NEPA, the agency must "evaluate a project's environmental consequences early in the planning process." *Churchill County v. Norton*, 276 F.3d 1060, 1078 (9th Cir. 2001). The environmental analysis should be done as soon as reasonably possible, which can affect the level of detail that can be included in the initial EIS. *See Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1073 (9th Cir. 2002).

Because the environmental analysis should not be postponed until the plans have been finalized, the NEPA requires "[r]easonable forecasting and speculation." *Id*. On the other hand, if a project is still in its earliest stages, the agency can "'defer detailed analysis until a concrete development crystallizes the dimensions of a project's probable environmental consequences.'" *Churchill County*, 276 F.3d at 1078 (quoting *Block*, 690 F.2d at 761).

In this case, the three segments were considered in the EIS. When evaluating the environmental consequences of the preferred alternative for the Sandpoint Byway segment, the report also considered the "general alignment features and design concepts." The three segments were again considered in the EA. In this report, new resource evaluations were not necessary for these segments because there had been no change, but the report indicates that they would be performed when sufficient details regarding the segments were developed. Therefore, the EA

MEMORANDUM ORDER                    7

only addressed the changes in relation to the Sandpoint Byway because there were not any

changes to evaluate in relation to the other three segments.

  Finally, the other segments were also evaluated in the re-evaluation.  Although the

Agencies did not have specific information, the design information they did have was

considered.  Furthermore, in all of the reports, it was indicated that each of the segments could

function independently of the other segments.

  To the extent possible, the Agencies evaluated the three segments in their reports despite

the fact that the segments had not even entered the design phase prior to the re-evaluation.

Consequently, the Agencies took a hard look at the impacts of all four phases and did not

improperly defer the consideration of the impact of those segments.

  C)  *The Agencies properly evaluated alternatives to the preferred action*

  NICAN argues that the Agencies failed to compare the current proposed Sand Creek

Byway with other alternatives.  This argument is based on NICAN's stance that the current

Project is substantially different than the Project analyzed in the EIS.  Because the Agencies

determined that the changes to the Project would not result in a significant impact on the

environment that required a supplemental EIS, they were not required to consider new

alternatives.

  An agency is not required to supplement an EIS every time new information is brought

forth unless the new information or changes will have a significant impact.  *Marsh v. Ore.*

*Natural Res. Council*, 490 U.S. 360, 373-74 (1989).  When preparing an EIS or supplemental

EIS, an agency is required to evaluate reasonable alternatives to the preferred action.  40 C.F.R.

§ 1502.14.  Therefore, if the changes would cause a significant impact, a supplemental EIS would be required and the agency would be required to thoroughly analyze the alternatives.

On the other hand, when preparing an EA, the agency is only required to include a brief discussion of the alternatives.  *Id.* § 1508.9.  In fact, the scope of an EA should be limited to issues that have not already been covered by a previous environmental report.  *See* 40 C.F.R. § 1501.7.  If there is a determination that the changes do not create a significant impact, there is no need to fully evaluate other alternatives that have already been evaluate in the EIS.

NICAN cites *Bob Marshall Alliance v. Hodel*, 852 F.2d 1223, 1229 (9th Cir. 1988), for the proposition that alternatives must be fully explored in an EA.  That case does not support the argument because it is distinguishable.  In *Bob Marshall Alliance*, the EA required an analysis of the alternatives because the agency never prepared an EIS.  *Id.*

In this case, unlike in *Bob Marshall*, there was an EIS that extensively evaluated alternatives.  After a finding of no significant impact, the Agencies were not required to re-evaluate alternatives.  Because the EIS had already addressed the alternatives, the EA's scope should not include a re-evaluation of those alternatives.

Additionally, the Agencies were not required to evaluate the two new alternatives set forth by NICAN.  First, the Agencies had already considered an alternative that was very similar to NICAN's through-town roundabout alternative.  Second, these alternatives are not "new information" that would need to be evaluated.  The Agencies determined that the changes would not cause a significant impact on the environment, so an analysis of new alternatives was not necessary.  *Cf. Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 557-58 (9th Cir. 2000).

MEMORANDUM ORDER                    9

The Agencies properly included a brief discussion of the alternatives in the EA and that discussion was sufficient to meet the NEPA requirements.[1]

      D)    *The Agencies's decision to not prepare an SEIS was not arbitrary and capricious*

When changes to a proposed action would result in significant environmental impacts that were not evaluated in the initial EIS, a supplemental EIS ("SEIS") should be prepared.  23 C.F.R. § 771.130(a)(1).  An SEIS should also be prepared if new information or circumstances related to the project would result in significant environmental impacts.  *Id*. § 77.130(a)(2).  An SEIS is only required when the agency determines that the impacts of the changes or new information will be significant.  *Id*. § 771.130(a).  If an agency is uncertain whether the impacts of a change or new information are significant, the agency can prepare on EA to assess those impacts.  *Id*. § 771.130(c).

An SEIS is required only when the changes are significant because requiring the agency to prepare an SEIS every time there was a change would make decision making intractable because the agency would constantly be "awaiting updated information only to find the new information outdated by the time a decision is made."  *Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 373 (1989).  Consequently, an agency is only required to prepare an SEIS when new changes or information creates significant impacts "'in a manner not previously evaluated or considered.'"  *Westlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 873 (9th Cir. 2004)

---

[1]NICAN cites a letter from the Army Corp of Engineers to support its argument that the Agencies needed to expand its alternative analysis after the changes were made.  Even if the Court were to consider this exhibit, it would not be sufficient to constitute a finding that the Agencies's decision to not re-evaluate the alternatives was arbitrary and capricious.

MEMORANDUM ORDER          10

(quoting *S. Trenton Residents Against 29 v. Fed. Highway Admin.*, 176 F.3d 658, 663 (3d Cir.

1999)).

NICAN makes three arguments to support its claim that the Agencies's decision to not

prepare an SEIS was arbitrary and capricious: 1) the changes to the Project would result in

significant impacts not evaluated in the EIS, 2) the Agencies failed to consider and evaluate the

"significance" factors before deciding to not prepare the SEIS, and 3) the Agencies failed to take

a "hard look" at two new alternatives to the Sand Creek Byway.

       1.     <u>The Agencies's determination that the changes would not result<br>in significant impacts not evaluated in the final EIS was not<br>arbitrary and capricious</u>

When determining whether impacts on the environment are "significant," the agency is

required to consider both context and intensity.  40 C.F.R. § 1508.27.  For context, the action

should "be analyzed in several contexts such as society as a whole (human, national), the

affected region, the affected interests, and the locality." *Id*. § 1508.27(a).  For intensity, the

agency should evaluate the severity of the impact.  *Id*. § 1508.27(b).  When evaluating the

intensity, the agency may consider up to ten factors.  *Id*.; *Ocean Advocates v. U.S. Army Corps of

Eng'rs,* 402 F.3d 846, 865 (9th Cir. 2005).  The Court will apply the six factors that NICAN

discussed: 1) proximity and impacts to wetlands, 2) controversy and uncertainty, 3) cumulatively

significant impacts, 4) National Register of Historic Places, 5) listed species, and 6) violation of

federal laws.  Looking at these factors individually and in the aggregate, the Court finds that the

Agencies decision that the changes would not result in significant impacts that had not already

been evaluated in the EIS was not arbitrary and capricious.

MEMORANDUM ORDER       11

a.  Proximity and impacts to wetlands

As part of the intensity evaluations, the agency may consider the "[u]nique characteristics of the geographic area such as proximity to . . . wetlands . . . ."  40 C.F.R. § 1508.27(b)(3).  The changes to the Project will result in further adverse affects on Sand Creek's wetlands and open water.  The Agencies recognized that the wetland impacts are expected to be greater than estimated in the EIS.

For the wetlands, initially 2.5 acres of wetlands were to be affected, but that amount had been mitigated by creating wetlands at Sandpoint High School.  In the EA, the Agencies recognized that an additional .32 acre would be impacted as a result of the construction of a railroad embankment segment.  However, the EA reported that the Agencies would apply with the appropriate agencies to mitigate the additional .32 acre of wetlands not already mitigated at the high school.  The re-evaluation reported that the additional wetland impacted would be replaced at a different wetland mitigation site.  Therefore, the Agencies fully mitigated the affects on the wetlands and its determination that the changes did not require an SEIS was not arbitrary and capricious.

For the open water, dredging will occur and fill material will be permanently and temporarily placed in Sand Creek below the ordinary high water mark.  The temporary fill material will be dredged after the activity using it is completed.  As a result of these activities, the normal pool elevation would not change, but the location of the elevation contour will permanently shift slightly.

MEMORANDUM ORDER                    12

NICAN sets forth the changes that will occur, but does not support with authority its

contention that the new impacts are significant.  The mere presence of negative effects does not

"necessarily rise[] to the level of demonstrating a significant effect on the environment."  *Native*

*Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1240 (9th Cir. 2005).  Although the fill

material would further impact the environment, NICAN has not demonstrated that the Agencies'

decision that it was not a significant impact was arbitrary and capricious.

b.  Controversy and uncertainty

Another factor NICAN discusses is whether "the effects on the quality of the human

environment are likely to be highly controversial."  40 C.F.R. § 1508.27(b)(4).  Additionally,

NICAN discusses "the degree to which the possible effects on the human environment are likely

to be highly controversial." *Id*. § 1508.27(b)(5).  A Project "is highly controversial when there is

'a substantial dispute [about] the size, nature, or effect of the major Federal action rather than the

existence of opposition to a use.'" *Anderson v. Evans*, 371 F.3d 475, 489 (9th Cir. 2004)

(quoting *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir.

1998)).  If a plaintiff provides experts that show inadequacies in the NEPA reports and cast

serious doubts on the agency's conclusions, the action is considered "controversial."  *See Blue*

*Mountains*, 161 F.3d at 1212.  Simply having opposition to an action does not render it

controversial.  *Wetlands Action Network v. U.S. Army Corps of Eng'rs*, 222 F.3d 1105, 1122 (9th

Cir. 2000).

To support its claim that the project is highly controversial, NICAN relies on

advertisements in a local newspaper; comments submitted by NICAN or its consultants that

dispute the effects on local businesses; and a letter from the Corps related to the CWA § 404

MEMORANDUM ORDER                    13

permit.[2]  First, the advertisements are not sufficient to indicate that the project is highly

controversial; the advertisements just indicate that those local businesses oppose the action.

Second, the comments submitted by NICAN and its consultants do not show that the

Agencies's decision was arbitrary and capricious.  The Agencies have the discretion to rely on

its own experts even if the contrary views are persuasive.  *See Ground Zero Center for Non-*

*Violent Action v. U.S. Dep't of Navy*, 383 F.3d 1082, 1090 (9th Cir. 2004).  The comments put

forth by NICAN are not enough to indicate that the Agencies's decision was arbitrary and

capricious.

Finally, NICAN cites to the Corp letter that expresses a concern that the shoreline

extension could negatively affect aesthetics.  A concern regarding aesthetics and a request to

evaluate a way to mitigate it does not mean a Project is highly controversial.  This concern

expressed by the corp is not sufficient to indicate that the Agencies's decision was arbitrary and

capricious.

---

[2]The Agencies argue that the Court should not consider the letter from the Army Corps to ITD related to ITD's § 404 permit application because it is extra-record evidence.  It is within the Court's discretion to determine whether it will consider this type of evidence.  *Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1144 (9th Cir. 2006).  Generally, the "review of agency action under NEPA is limited to the administrative record and may only be expanded beyond the record to explain decisions."  *Id.*  However, district courts can admit extra-record evidence

(1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision" (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith."

*Id.* at 1145 (quoting *The Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)).  The Court exercises its discretion and will consider the letter.  The letter is relevant to address whether the Agencies considered all of the relevant factors and the Agencies included the 404 application and follow-up correspondence in the administrative record.

MEMORANDUM ORDER                    14

NICAN claims that the Project is uncertain because the other three segments have never been meaningfully considered. As explained above, the other three segments were evaluated to the extent possible in the EIS. Although the details of those segments could not be evaluated because they were still in the planning stages, the Project is not highly uncertain nor does it involve unique or unknown risks. Furthermore, NICAN's argument that the Agencies never considered the impacts of the plan to dredge Sand Creek is not correct. The Agencies did consider the impacts in the re-evaluation, which can be used to evaluate impacts. *See Price Road Neighborhood Ass'n, Inc. v. U.S. Dept. of Transp.*, 113 F.3d 1505, 1510 (9th Cir. 1997). Consequently, NICAN has not shown that the Agencies's conclusion was arbitrary and capricious.

### c.  Cumulatively significant impacts

Another factor is "[w]hether the action is related to other actions with individually insignificant but cumulatively significant impacts." 40 C.F.R. § 1508.27(b)(7). The regulations further clarify that the agency cannot break down the project into small component parts to avoid significance. *Id*.

NICAN claims that the eleven changes to the EA combined with the dredging plans in the re-evaluation have a cumulative significant impact. NICAN claims that the agency avoided this problem by breaking the Project into three component parts: 1) the original design in the EIS, 2) the eleven changes in the EA, and 3) the dredging of Sand Creek in the re-evaluation.

The purpose of the cumulative significant impact factor is to evaluate whether the current action has a significant impact on the environment "when added to *other* past, present, and reasonably foreseeable future actions." *See* 40 C.F.R. § 1508.7 (emphasis added). Therefore,

MEMORANDUM ORDER                  15

the cumulative impact analysis is based on the projects affect on other projects, not the various stages of the same project.  In this case, the EIS contained a cumulative impact analysis that addressed the impacts of the Project on other actions, including other highway actions.

Additionally, to address NICAN's argument related to this factor, the Agencies properly addressed the environmental impacts as the issues arose throughout the progression of the Project.  The Agencies evaluated the changes in the EA and the re-evaluation, which included an evaluation of the overall impact of the entire project.

### d.  National Register of Historic Places

NICAN also addresses the factor that states the Agencies should consider the "degree to which the action may adversely affect . . . sites . . listed in or eligible for listing in the National Register of Historic Places . . . ."  40 C.F.R. § 1508.27(b)(8).  NICAN argues that the changes to the Project will include extensive earthwork within the Depot's protected 15-foot buffer, which was not addressed in the EIS.

The Agencies and the State Historic Preservation Officer entered into a Memorandum of Agreement that accounts for the effects of the Project and its design changes on the historic properties.  This agreement sets forth the steps that the Agencies agreed to take in order to mitigate the effects on the historic properties.  Based on this, the Agencies's determination that the affect on historic properties is not a significant impact is not arbitrary and capricious.

### e.  Listed species

Another factors addressed by NICAN is "the degree to which the action may adversely affect an endangered or threatened species . . . ."  40 C.F.R. § 1508.27(b)(9).  When evaluating this factor, the agency looks at the "degree of adverse effect on a species, not the impact on

MEMORANDUM ORDER                    16

individuals of that species." *Envtl. Prot. Info. Ctr. v. U.S. Forest Serv.*, 451 F.3d 1005, 1010 (9th Cir. 2006). Based on this, it is not arbitrary and capricious for an agency to determine that even if "there is some effect on individuals pairs, this will not cause a significant adverse effect on the species and require an EIS." *Id*. at 1011.

In this case, NICAN claims that even though the EIS evaluated the affect on bald eagles, the discovery of two new eagle nests suggests that eagles will be impacted in ways not previously analyzed. This potential effect on individual pairs of new eagles is not sufficient to require the Agencies to determine there is a significant impact. Furthermore, the Fish and Wildlife Service concurred that the Project is not likely to affect the bald eagles. Consequently, the Agencies's determination that the Project would not adversely affect listed species is not arbitrary and capricious.

### f.  Violations of federal laws

The final factor the NICAN addresses is "[w]hether the action threatens a violation of Federal . . . law or requirements imposed for the protection of the environment." 40 C.F.R. § 1508.27(b)(10). NICAN claims that the changes to the Project threaten to violate (1) § 4(f) of the Department of Transportation Act, (2) § 404 of the Clean Water Act, and (3) Executive Order 11990.

As explained below, the changes do not violate § 4(f). As for § 404 of the Clean Water Act, the Agencies have been complying with the process to get the appropriate Section 404 permit. The NEPA documents recognize that the permit was needed and the Agencies are still in that process of obtaining the permit. The Agencies have also complied with Executive Order 11990 throughout the process. This compliance has not been affected by the changes and the

MEMORANDUM ORDER                    17

Agencies's decision that it would not result in a significant impact was not arbitrary and capricious.

2. <u>The Agencies properly considered the significance of the impacts</u>

NICAN claims that the Agencies never applied the significant factors required by the NEPA before deciding to not prepare an SEIS.  As part of this argument, NICAN argues that the Agencies improperly determined that an SEIS was not necessary before finalizing the EA and issuing its re-evaluation.

First, when evaluating the significance of changes, an agency "may" consider the ten factors.  *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 865 (9th Cir. 2005).  In this case, the Agencies properly examined the factors even though they did not do a factor-by-factor fashion.  *See Spiller v. White*, 352 F.3d 235 (5th Cir. 2003) (holding that a factor-by-factor evaluation was not necessary because all the factors were in some way addressed and evaluated).  The Agencies evaluated the various factors in the various NEPA documents and its overall determination that the changes would not result in a significant impact was not arbitrary and capricious.

Second, the Agencies did not improperly determine that an SEIS was not necessary before finalizing the EA and re-evaluation.  An EA can be prepared when an action "does not clearly require the preparation of an EIS, or where the [agency] believes that an EA would assist in determining the need for an EIS."  23 C.F.R. § 771.119(a).  In other words, an EA can be used when it is not clear whether an EIS is necessary or when an EA would help determine whether the EIS is necessary.

MEMORANDUM ORDER                    18

The documents that NICAN cites for this argument do not clearly support its assertion. The Email Exchange and Memorandum of Record was not discussing whether an SEIS was necessary after the changes; they were addressing whether a new draft EIS or supplement to the draft EIS were necessary before the final EIS was submitted.  The summary of the meeting notes simply states that the attendees agreed that the Agencies may proceed with an EA; the notes did not state that an SEIS was not still in consideration.

Finally, NICAN cites an email that states the Agencies must clearly explain why they chose to do an EA rather than an EIS.  NICAN argues that this email shows that the Agencies determined that it would not prepare an SEIS even before the EA was finalized.  However, after that section of the email, the email explains that if "it is ultimately recommended than a supplemental EIS is not necessary, written support for that recommendation must be adequate . . . ."  Therefore, the email does not indicate that the Agencies had already decided against an SEIS before the EA was finalized.  It simply shows that the Agencies were aware that they needed to support their decision in the EA if they determined there was no significant impact, which is the purpose of the EA.  Consequently, the record does not show that the Agencies improperly determined that there would be no SEIS before they completed the EA and re-evaluation.

      3.        <u>The Agencies took a "hard look" at the alternatives and were not required to evaluate the two new alternatives to the Sand Creek Byway.</u>

As explained above, the Agencies properly included a brief discussion of the alternatives in the Revised EA and that discussion was sufficient to meet the NEPA requirements.

E.      *The Agencies properly took a "hard look" at impacts on Sand Creek*

NICAN claims that the Agencies failed to take a hard look at how the Project would

impact the aquatic resources of Sand Creek.  NICAN's arguments include that the Agencies (1)

failed to properly evaluate its plans to dredge Sand Creek, (2) failed to take a hard look at water

quality, (3) failed to consider the impacts of the Project on Sand Creek's shallow water habitat.

NICAN's first argument is based on the fact that the Agencies did not evaluate the

impacts of dredging on the Sand Creek until it prepared the re-evaluation.  When a project is

changed after an EA and EIS have been prepared, the agency may conduct a re-evaluation to

"determine the significance of the new design's environmental impacts and the continuing

validity of its initial EA."  *Price Rd. Neighborhood Ass'n, Inc. v. U.S. Dept. of Transp.*, 113 F.3d

1505, 1510 (9th Cir. 1997).  However, if the changes are significant, the agency must prepare a

supplemental EA or SEIS rather than a re-evaluation.  *Idaho Sporting Congress Inc. v.*

*Alexander*, 222 F.3d 562, 566 (9th Cir. 2000).  Additionally, a re-evaluation cannot be used to

present analysis that was required to be included in the original NEPA documents.  *Id*. at 566-67.

In this case, the Agencies were not required to include the dredging analysis in the EA or

EIS because the dredging issue was not resolved until after the EA was finalized.  The Agencies,

therefore, included the dredging analysis in the first report it prepared and gave it the requisite

"hard look" required by the NEPA.

NICAN's second and third arguments are that the Agencies failed to take a hard look at

the impacts on water quality and the mudflats.  NICAN claims that the EA fails to include any

analysis of the impacts of the changes.  The EA and re-evaluation set forth information about the

MEMORANDUM ORDER                        20

water quality concerns and even includes mitigation measures to reduce the impacts.  The

Agencies gathered baseline water quality data and developed a Storm Water Pollution

Prevention Plan.  These sections within the EA and re-evaluation  are sufficient to determine that

the Agencies took a hard look at the water quality issues related to the changes.

>        F.        *The Agencies properly took a "hard look" at the impacts on historic properties*

NICAN claims that the Agencies did not take a "hard look" at the impacts of the changes

on the depot.  NICAN argues that all of the information regarding the effects on the depot,

including the settlement and vibration impacts, must be included in the actual NEPA documents.

NICAN cites *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208 (9th Cir. 1998)

to support this argument.

In *Blue Mountains*, the court held that the agency's defense of its position to not prepare

an EIS must be found in the EA.  *Id*. at 1214.  That case does not require all of the analysis to be

included in the NEPA documents, but does state that the EA should contain references to

material in support of its conclusions.  *Id*.

In this case, the Agencies addressed the impacts on the depot in both the EIS and the EA.

Even though, the additional impacts that NICAN discusses such as the settlement, vibrations,

and noise were not specifically analyzed in the EIS or EA, those reports did discuss other

impacts on the depot that it was aware of at the time the reports were prepared.  Furthermore,

once the Agencies had further evaluated the impacts on the depot and consulted with the Idaho

State Historic Preservation Office, they submitted a Memorandum of Agreement that dealt with

mitigating the effects on the depot.  Not only did the Agencies submit this Memorandum of

Agreement to the Advisory Council on Historic Preservation, it also incorporated it in its re-

MEMORANDUM ORDER              21

evaluation.  Therefore, although the updated evaluation of the effects on the depot were not

included in the EA, it was included in the re-evaluation and the Agencies properly took a "hard

look" at the effects on the depot.

## II.    Section 4(f) Claims

Section 4(f) of the Department of Transportation Act provides that the Secretary may

approve a transportation project that requires the use of land of an historic site only if certain

requirements are met.  49 U.S.C. § 303.

Pursuant to section 4(f), major consideration should be given to historic preservation

when evaluating highway construction proposals.  *Stop H-3 Ass'n v. Coleman*, 533 F.2d 434 (9th

Cir. 1976).  Under the statute, if a proposal requires the "use" of an historic site, it can be

approved only if "(1) there is no prudent feasible alternative to using that land; and (2) the

program or project includes all possible planning to minimize harm to the . . . historic site

resulting from that use."  49 U.S.C. § 303(c).  These requirements are satisfied if the Secretary

determines that the project has a de minimis impact on the area.  *Id*. § 303.

NICAN argues that the Agencies violated section 4(f) by: (1) failing to survey, identify,

and evaluate the 4(f) properties in three of the segments of the Project; and (2) arbitrarily

determining that the construction and operation of the Project would not result in the "use" of the

depot.  In a separate motion, NICAN also moved to supplement the administrative record with or

take judicial notice of an extra-record letter.

### A.      *The Court will supplement the record with the letter*

NICAN moves to supplement the administrative record with a letter that it received from

the Idaho State Historical Society more than five months after the close of briefing in this case.

MEMORANDUM ORDER                    22

The Agencies argue that the Court should supplement the record with this letter because it violates this Court's order and is extra-record evidence.

As explained in relation to the corps letter, it is within the Court's discretion to determine whether it will supplement the record. *See Nw. Envtl. Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1144 (9th Cir. 2006). Although the review of agency action is typically limited to the administrative record, district courts can admit extra-record evidence

> (1) if admission is necessary to determine "whether the agency has considered all relevant factors and has explained its decision" (2) if "the agency has relied on documents not in the record," (3) "when supplementing the record is necessary to explain technical terms or complex subject matter," or (4) "when plaintiffs make a showing of agency bad faith."

*Id*. at 1145 (quoting *The Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005)). The Court exercises its discretion and will consider the letter. The letter is relevant to address whether the Agencies properly considered the relevant factor of the Project's impact on the historic properties.

    B.    *The Agencies properly evaluated the historic 4(f) properties in the four segments of the Project*

NICAN argues that the Agencies improperly postponed the analysis of impacts to historical properties on all four segments of the Project. Under section 4(f), use of lands from a section 4(f) properly should be evaluated early in the process when alternatives are being considered. 23 C.F.R. § 771.135(b). Furthermore, when identifying properties that are on the National Register of Historic Places eligible for that register, the agency is required to consult with the State Historic Preservation Officer. *Id*. § 771.135(e).

MEMORANDUM ORDER          23

To support its argument that the Agencies did not properly consider the other three segments, NICAN cites a letter written by the Idaho State Historical Society.  That letter states that the office had reviewed and commented on the Sand Creek Byway segment, but had not reviewed the remaining three segments.  The letter further states that they expect that they will have the opportunity to provide comments on the remaining three segments prior to the construction activities.

Although the Agencies did not consult with the State Historic Preservation Officer regarding the three segments prior to the preparation of the various NEPA documents, the Agencies did address the historical properties to the extent possible.  As with the other issues raised by NICAN, the plans for the other three segments had not been finalized, so the Agencies can only evaluate their impact to the extent that the plans have been created.

Even though the Agencies could have more thoroughly evaluated the impacts on the historic properties, they did include the three segments in their investigation.  First, there is the Overview that addresses cultural resources and potential impacts.  Even though the Overview was preliminary and additional investigations were necessary, it did address the historical properties.  The additional investigations will take place as the project progresses.  Second, Figure 10 in the EIS shows a preliminary map that sets forth potential cultural and historical sites.  Again, this is just a preliminary map of areas that might include historic sites, but it is sufficient at this stage of the Project.  Third, the Agencies cite the Record of Decision that states the initial investigation identified historic sites along the entire corridor of the Project.  This general statement alone is not sufficient to indicate that it was properly evaluated because it

MEMORANDUM ORDER                    24

contains no other information.  However, the Overview and Figure in the EIS were sufficient based on the fact that the plans for the other three segments had not been finalized.

NICAN's argument that it was reasonably possible to analyze the impacts on all four segments because the Agencies knew the precise location and widening work needed is unavailing.  Even though the Agencies could have identified all of the historic properties in the vicinity of the entire project, they would not know how the construction would affect the properties until the construction had been planned.  As NICAN itself argues in relation to the Sand Creek Byway, the Agencies could not fully evaluate the affects of the construction (i.e., the affect of the settlement) until the construction plans were more finalized.  The Agencies should evaluate the impacts to the extent possible, but the full impacts of the Project would not be fully evaluated until the plans had been finalized.  Therefore, the Agencies evaluated the impacts on the 4(f) properties in the three segments to the extent possible early in the process and will be reevaluated according to FWHA regulations in the future.  The agencies did not violate section 4(f).

      B.     *The Agencies's section 4(f) evaluation for the depot was not arbitrary and capricious*

NICAN argues that the Agencies should have conducted a formal section 4(f) analysis on the depot because (1) the Project will result in physical or actual use of the depot, and (2) the Project will result in constructive use of the depot.  In the EA, the Agencies concluded that none of the proposed improvements around the depot constitute "use" of the depot and a section 4(f) evaluation was not necessary.

The regulations state that use occurs "(i) [w]hen land is permanently incorporated into a transportation facility, (ii) [w]hen there is a temporary occupancy of land that is adverse in terms

MEMORANDUM ORDER          25

of the statute's preservationist purposes . . . ; or (iii) [w]hen there is constructive use of the land."

23 C.F.R. § 771.135(p).

### 1.   The Project will not result in the physical use of the depot

NICAN argues that the Project will involve physically using the depot; however NICAN

does not cite any part of the Project that will actually physically use the depot property.  Instead,

NICAN cites to activities that will occur near the depot, such as the retaining wall and

embankment.  NICAN fails to present any evidence that these activities will physically use the

depot.

The activities that will occur near the depot such as work on the access road and curb on

the west side of the depot are meant to improve those facilities and will not adversely affect the

depot.  Furthermore, the activities to improve the area around the depot are being implemented

due to recommendations in the Memorandum of Agreement.  These improvements are designed

to improve the depot and are not highway project components.  Consequently, there is no

physical use of the depot that would trigger a section 4(f) evaluation.

### 2.   The Project will not result in constructive use of the depot

NICAN argues that the Project will result in constructive use of the depot because of

vibrations caused by pile driving, earthwork, and traffic; visual and audible intrusions; and

impacts to the overall setting.  Under section 4(f), "use" is not limited to physical taking, "but

includes areas that are significantly, adversely affected by the project."  *Alder v. Lewis*, 375 F.2d

1085, 1091 (9th Cir. 1982).  Constructive use does not occur when the overall impacts caused by

the project "do not substantially impair the activities, features, or attributes" of the property.  23

C.F.R. § 771.135(p)(5)(vi).

MEMORANDUM ORDER                          26

In this case, the Agencies properly concluded that the overall impacts of the Project will not substantially impair the activities or features of the depot.  This is true especially in light of the mitigation measure taken as a result of the Memorandum of Agreement.  Therefore, there is no constructive use of the depot and the Agencies did not violate section 4(f).

### Order

Based on the foregoing, the Court being fully advised in the premises it is **HEREBY ORDERED** that:

1.  The Plaintiff's Motion for Summary Judgment (docket no. 32) is **DENIED.**

2.  The Defendants' Cross-Motions for Summary Judgment (docket nos. 35 and 38) is **GRANTED.**

3.  The Plaintiff's Motion to Supplement the Administrative Record (docket no. 47) is **GRANTED.**

    **SO ORDERED.**

DATED:  **March 27, 2008**

Honorable Edward J. Lodge
U. S. District Judge

MEMORANDUM ORDER                    27